FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 SEP -8 AM 9: 12

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOSEPH A. RUSSELL and
JAMES E. WALLACE,

PLAINTIFFS,

v.

CASE NO.: CV-99-J-669-S

GEORGE FLEMING, et al.,

DEFENDANTS.

ENTERED

SEP  2000

## MEMORANDUM OPINION

Currently pending before the court is the defendants' motion for summary judgment

(doc. 43) to which the plaintiffs have responded and all parties have submitted briefs and

filed evidence in support of and in opposition to the motion.  This motion was further

considered by the court at its August 31, 2000 motion docket at which time all parties were

present by and through counsel and the court heard oral argument on said motions.  The court

having considered said motion and argument, the court makes the following findings of fact

and conclusions of law.

## I.  Factual Background

The plaintiffs are two individuals who were inmates at the Bibb County Jail and were

so situated at the time this suit was filed.  The only defendants remaining in this action are

Arthur Harris, the Chief Jailer, and George Fleming, the Sheriff of Bibb County.  The

plaintiffs allege both that the physical condition of the jail was in violation of their

constitutional rights and that the manner in which they were treated at the jail was in

63

violation of their constitutional rights. *See* Complaint at 1. Count I of the complaint asserts a 42 U.S.C. § 1983 claim against Sheriff Fleming for the above alleged violations of the plaintiffs' civil rights. Count II alleges the same claim against the chief jailer of the county.[1] Count V requests attorney's fees and costs under 42 U.S.C. § 1988. The plaintiffs also filed an amended complaint (doc. 17) alleging violations of their rights under the Americans with Disabilities Act ("ADA") as Count VI.

The court finds the facts of this case, in the light most favorable to the plaintiffs, to be as follows:

Plaintiff Wallace was arrested and placed in the Bibb County Jail ("the jail") in June, 1998.[2] Complaint at ¶ 10; defendants' motion for summary judgment ("defendants' motion") at 2. Russell was arrested and incarcerated in the Bibb County Jail sometime around November, 1998.[3] Complaint at ¶ 10. The plaintiffs allege that the jail is in deplorable condition, having exposed wires, exposed pipes, and an inadequate fire escape system. *Id* at ¶¶ 11-14. Further, the plaintiffs complain that the plumbing is inadequate, often causing flooding and possible exposure to waste products, and that the ceiling leaks, also causing

---

[1]Count III stated a 42 U.S.C. § 1983 claim against the county and the county commission, who have previously been dismissed from this action. Count IV made state law claims against the same parties.

[2]Wallace is now an inmate in the custody of the Alabama Department of Corrections. Depo. of Wallace at 7.

[3]Russell is currently incarcerated at the Washington Correctional Institute in Chipley, Florida. Depo. of Russell at 16-17; defendants' motion at 2.

flooding.  *Id.* at ¶¶ 16-18.  Plaintiffs claim such conditions constitute a violation of their constitutional rights.  *Id.*  at ¶ 19.

Plaintiff Russell alleges that in February, 1999, he began having suicidal thoughts and requested psychiatric care.  He told a jailer that he was having suicidal thoughts, for which he was "belly chained" and placed in the drunk tank.[4]  *Id.* at ¶¶ 26; first amendment to complaint at ¶ 65.

Plaintiff Wallace alleges he is a diabetic who requested medical treatment while at the jail.  Complaint at ¶ 27.  Wallace states that due to his requests being ignored, he lapsed into a diabetic coma and was transported to a hospital where he received treatment and recovered. *Id.*

The plaintiffs further allege that the food they were served while in jail was nutritionally inadequate and that the sheriff pockets the difference between the money budgeted to feed the inmates and the amount he actually spends.  *Id.* at ¶¶ 29-30.  The plaintiffs also allege that they were not provided adequate toiletry items.  *Id.* at ¶ 32.

In their amendment to the complaint, the plaintiffs further claim that inmate grievances and requests for medical care were routinely ignored.  First amendment to complaint at ¶ 50-52.

---

[4]The parties use, and the court adopts, the term "belly-chained" to refer to a restraint system in which a chain is placed around the inmates middle and his hands and feet are then handcuffed thereto.

## A.  42 U.S.C. § 1983 – Lack of Medical Care

### 1.  Russell's claim

The defendants state "It is the policy of the Bibb County Jail that if an inmate indicates a suicide threat through words or actions, the jailer will contact a representative from the Indian River Mental Health Facility and seek advice from the on call professional." Declaration of Fleming at 1; declaration of Harris at 1.  The defendants state further that their policy entails:

> [I]f an inmate needs to be separated from the general population, the inmate would be placed in the Holding Cell (Cell 1) on the first floor near the jailer's station .... All bedding material will be removed from the cell prior to the inmate being placed in the cell and all items such as belts and shoelaces will be removed from the inmate prior to his being placed in the cell.  If the suicide risk is severe, restraints may be used for the purpose of preventing the inmate from harming himself/herself.  Restraints are a temporary measure and mental health personnel from the Indian River Mental Health Facility should be notified.

Declaration of Fleming at 1; declaration of Harris at 1.  The policy further states:

> If the inmate requests psychiatric attention, the inmate is to be referred to the mental health counselor with the Indian River Mental Health Facility.  If an inmate requests urgent mental health counseling or treatment, the counselor on call with the Indian River Mental Health Facility is to be contacted.

Declaration of Fleming at 2, declaration of Harris at 2.

The defendants state "If Russell ever requested mental health care and was denied treatment, it would violate jail policy.  To my knowledge, Russell was never denied medical treatment."  Declaration of Fleming at 3; declaration of Harris at 3.  Kevin Crowe, a past jail

4

employee, states that he saw Harris wad up either an inmate grievance form or a request for medical attention on one occasion. Affidavit of Crowe at 1. He also saw another jailer throw out an inmate's request for medical attention. *Id.* Crowe also states that he saw inmates go for weeks without medical attention, despite repeated written and oral requests for it. He states that this "was not an uncommon practice at the Bibb County Jail." *Id.* at 1-2.

Russell states that he was placed in the holding cell on two occasions for telling someone he was going to hurt himself or commit suicide. Russell depo. at 24. The defendants admit that in late February or early March, Russell threatened to commit suicide. Defendants' motion at 5. Russell testified during his deposition that he became very depressed in February or March, 1999 and decided he needed counseling. Depo. of Russell at 19, 24. He states he had made no prior suicide attempts, but had made threats to this extent. *Id.* at 20. He told Mr. Boddie (a jailer in Bibb County), about 10:00 in the morning, that if he was not gotten psychiatric help, "there was going to be a body on his hands."[5] *Id.* at 20, 25. Russell states Boddie told him he would tell Harris.[6] About 2:00 that afternoon, Officer Caddell told the plaintiff to come downstairs with him, at which point the plaintiff

---

[5]The plaintiff first agrees that this took place in April, and then agrees that it was May, but it could have been late February or early March, 1999. Other evidence supports his initial suicide threat as occurring in late February or early March, 1999, which the defendants concede. *See* defendants' motion at 5; depo. of Russell at 19, 20, 24-25, 62.

[6]In *Wood v. Bibb County*, CV-98-P-1523-W, Harris testified at deposition that he is directly responsible for the supervision of the jailers at the jail and that he reports to Sheriff Fleming. Depo. of Harris at 12, Exhibit 1 to plaintiffs' evidentiary submissions. He further explained he told Fleming "[a]nything that I feel that is pertinent that he need (sic) to know. I talk to him on a daily basis and inform him of basically anything that I feel he need (sic) to know." *Id.* at 13. He later stated "If there's an inmate that's sick we talk about that" and he estimated such conversations to occur three to four times a week. *Id.* at 15.

was cuffed with a belly chain and placed in the drunk tank (also referred to as the "holding cell" or "cell one"[7]). *Id.* at 25. Russell states Officer Caddell told him this was because of the statement he had made and also told the plaintiff he would call Indian Rivers to try to get someone to talk to Russell. *Id.* at 26. No one from Indian Rivers came to see him that day. *Id.* at 26. In fact, Russell testified he did not see anyone from Indian Rivers until three or four weeks later. *Id.* at 66.

The plaintiff remained in the drunk tank until the next morning between 8 and 9 a.m. when Harris released him. *Id.* at 30. Russell states "I just kept telling him I needed some help and he said they called Indian Rivers, but I never seen them." *Id.* at 31. At that point, Harris escorted Russell back to his cell. *Id.* Harris relates that he returned Russell to his cell because Russell told him that he was not going to hurt himself, but rather was just playing around.[8] Depo. of Harris at 41, 42. Harris testified that "[a]t any rate, he should be in those

---

[7]Depo. of Harris at 41.

[8]Harris also testified that Russell was in the drunk tank for six to eight hours and only belly chained for one and a half to two hours. Depo. of Harris at 39. The court notes that Harris previously testified, in the same deposition, that Caddell placed Russell in belly chains when he put him in the drunk tank "some time that night or early morning" and that he personally uncuffed Russell when he came into work around six a.m. *Id.* at 36-39, 59-60. Even assuming Harris' times are correct, his own testimony supports Russell being belly chained the entire time he was in the drunk tank. The court also notes that the amount of time Russell was so kept is in dispute, but by Harris' own testimony was at least six hours. Harris later testified as follows:

> Q. Now, according to your testimony, he was not in restraints – he had already said he was going to harm himself prior to being put in the drunk tank in the first place. And for, according to your testimony, about, correct me if I'm wrong, about four hours went by, after he said he was going to hurt himself, about four hours went by where he wasn't restrained; correct?
> A. Yes, sir.
> Q. What was it that caused him to become restrained in those cuffs, ankle and wrist?
> A. I don't know.

restraints no more than one and a half to two hours, no more than that." *Id.* at 51. He further testified that if the inmate is "alive and breathing and coherent" he should not remain chained. *Id.* at 62. However, the jail has no written policy concerning any criteria on whether an inmate should remain chained. *Id.* at 63.

The jail's written report of this incident is either missing, misfiled, or lost. *Id.* at 30-32. Harris testified that Caddell's reasons for placing Russell in belly chains and in the drunk tank were in this missing report, which he saw. *Id.* at 38. He further testified he remembered from the report that this action was taken so Russell could not harm himself. *Id.* He does not remember whether or not he asked Caddell on what he based the determination Russell posed a threat to himself. *Id.* Harris did remember that in February, 1999, Russell was in the holding cell six to eight hours.[9] *Id.* at 41. Harris also testified that he believed he told Fleming about this incident orally, although he does not remember exactly what he told Fleming. *Id.* at 32-33.

Fleming testified in deposition that he did not follow-up to see if Indian Rivers was ever contacted on this occasion because that would be Harris' job. Depo. of Fleming at 15-16. However, Fleming did state that when a jailer is notified an inmate is having suicidal

---

Q. Did you ask Jailer Caddell what it was that caused him to cuff Joey Russell like that?
A. I can't remember.

Depo. of Harris at 66-67.

[9]The court notes that by Russell's calculation he was actually belly chained in the cell for approximately eighteen hours.

thoughts and/or wants to see a mental health professional, the jailer should contact Indian Rivers "as soon as possible" and "within an hour." *Id.* at 16. Fleming further stated if an inmate requested urgent mental health counseling and the jailer to whom the request was made did not contact Indian Rivers, that would be a violation of Bibb County Jail policy. *Id.* at 28-29. Harris' job includes making sure that the jailers comply with this policy. *Id.* at 29. Harris testified that Caddell did contact Indian Rivers in February, 1999 regarding Russell's suicide threat. Depo. of Harris at 34-35. No record of such a contact being made has been submitted to the court.

Fleming also testified that he had seen a written statement of Russell's detailing the first time he was belly-chained and placed in the holding cell. According to Fleming, he did not question anybody about this incident and did no investigation. Depo. of Fleming at 37-40.

The plaintiff eventually talked with Trent Bamburg, a counselor at Indian Rivers, and Eddie Hubbard, also a counselor. Depo. of Russell at 33. Russell testified:

> Q. When was the first time you were visited by someone from Indian Rivers?
>
> A. The first time that I talked to the people I was a cook and I was walking in the booking room and in the intoxilizer room I seen one of them guys from Indian Rivers. A guy told me, hey, there's the guy from Indian Rivers right there; you need to talk to him.
>
> Q. Who did you talk to?
>
> A. I call him Bo Peep, but his name is Elisas (sic) something.

8

Q.  Was he another inmate?

A.  Yes, sir, another inmate.

....

Q.  Would it have been approximately a week or two after this incident when you were taken into the holding cell?

A.  Could have.  I don't know without something in front of me with the dates, I couldn't tell you.

....

Q.  So Trent Bamburg is the first person you saw from Indian Rivers, is that right?

A.  Yes, sir.

...

A.  Well, I seen [Bamburg] in the intoxilizer room.  I was in the day room where a coke machine is and Bo Peep told me that's the guy from Indian Rivers.  And that's why I went in there and talked to him.

Q.  And what did you talk to him about?

A.  I just told him I feel bad; I feel like suicide and I needed some psychiatric help.

....

Q.  So you saw him the first time, maybe, in early March, and then a couple of weeks later you started seeing him every week?

A.  Every Wednesday, yes.

Depo. of Russell at 32-33, 35.  Bamburg states he first met with Russell on March 3, 1999, when Russell described to Bamburg feelings of suicidal ideation.  Declaration of Bamburg

at 1. According to the Indian Rivers records, this first meeting on March 3, 1999 was the incident described above, wherein Russell approached Bamburg at the jail while Bamburg was there to assess another inmate. Plaintiffs' Exhibit 11, March 3, 1999 record. Bamburg again saw Russell on March 9, 1999, after being notified by the jail staff that Russell had threatened to commit suicide. Declaration of Bamburg at 1. However, no record of a March 9, 1999 meeting has been submitted to the court. They met again March 17 and 31, 1999. As with the March 9 meeting, no record of a March 17, 1999 meeting was submitted either.[10]

At the meeting on the 31st, Bamburg noted that Russell seemed preoccupied with death, although he denied current plans to kill others or himself. Declaration of Bamburg at 1-2; plaintiffs' Exhibit 11, March 31, 1999 record. Bamburg told a jailer (Boddie) to restrict Russell's access to items such as "razors, glass, aluminum soda cans, clothing which could be used to harm self, etc." *Id.* Bamburg contacted Taylor Hardin and the district court, and tried to reach Russell's attorney to set up an evaluation. *Id.* On April 5, 1999, Bamburg again was notified by the jail when Russell filed a grievance and indicated suicidal thought. Declaration of Bamburg at 2. Bamburg again tried to contact Russell's attorney to assist in getting him evaluated by Taylor Hardin. Exhibit 11, April 5, 1999 record. Bamburg went to the jail, and learned from Russell that he had been placed in the drunk tank as punishment for smoking a cigarette. *Id.* Bamburg noted self-inflicted scratches on Russell at this time.

---

[10]The court does note that March 17, 1999 would have been a Wednesday, which was the day Russell stated group therapy sessions were held at the jail. The 9th however, was a Tuesday.

*Id.*  The grievance filed by Russell, dated April 4, 1999, states "I am going to commit suicide." Plaintiffs' Exhibit 17.  In this grievance, Russell states he cannot handle the drunk tank and that "it stinks that you can't use the restroom."  He also states "I need some real phystric (sic) help because talking to Trent and Mr. Hubbard is not doing me no good.  What do I have to do to get some help?"  Plaintiffs' Exhibit 17.  Boddie noted on the grievance form that he contacted Indian Rivers and spoke with Bamburg on April 5, 1999.  *Id.*

A record dated April 17, 1999 reflects that Bamburg spoke with Chief Jailer Harris concerning Russell, apparently while at Wal-Mart.  Plaintiffs' Exhibit 11, April 17, 1999 record.  Harris reported that Russell's behavior was much improved.  *Id.*  Bamburg next met with Russell on April 28 and May 12, 1999.  Declaration of Bamburg at 2; Exhibit 11, April 28, 1999 and May 12, 1999 records.

The second occasion in which Russell was belly-chained and placed in the holding cell was in May, 1999, when he cut his wrist.  Chapman, a jailer, states by declaration that at approximately midnight in May or June, 1999, while making his rounds, he found Russell in his cell lying face down with his wrist in a container full of water.  Declaration of Chapman at 1, depo. of Russell at 40.  The plaintiff explained he held his hand in the water to prevent clotting.  Depo. of Russell at 39.  Chapman states he immediately radioed for assistance and paramedics and some deputies arrived soon thereafter.  Declaration of Chapman at 1.  He states "the paramedics had given him an IV and bandaged Russell's wrist.  By then Russell was up and about and looked to be feeling better.  The paramedics told us

11

that Russell was fine and did not recommend that he be taken to the emergency room."
Declaration of Chapman at 1.

Felicia Davis, the assistant chief jailer, states that she was called at home regarding
this incident and went immediately to the jail. Declaration of Davis at 1. She personally
assisted in cleaning up Russell's cell. She states, "the paramedics had bandaged Russell's
wrist and Russell looked fine. The paramedics told us that there was no need to transport
Russell to the hospital and that it would be okay to leave him in the jail." *Id.* She called
Bamburg at this time and he told her to place Russell in a downstairs cell so he could be
monitored closely. *Id.* Bamburg states that on May 28, 1999, he was called at 1:00 a.m.
regarding the suicide attempt by Russell. Declaration of Bamburg at 2; plaintiffs' Exhibit
11, May 28, 1999 record. He states he learned from Felicia (Davis) that the plaintiff had cut
his wrist and needed stitches. Bamburg again tried to contact Russell's attorney and sent him
a letter. Declaration of Bamburg at 2. He also spoke with the district judge and sent a letter
to the circuit judge assigned to Russell's criminal case. Plaintiffs' Exhibit 11, May 28, 1999
record.

Chapman states he placed Russell in a downstairs cell and went to check on him
fifteen minutes later. Declaration of Chapman at 2. Russell had obtained sheets he had
braided together when he was living in this same cell previously.[11] Depo. of Russell at 44.

---

[11]The court notes the sheets were apparently braided by Russell on an earlier occasion and
never removed from the cell, according to his testimony.

12

He tied the sheet to a bar. *Id.* Chapman discovered Russell putting a noose of sheets around his neck. He got Russell down and again called dispatch. Declaration of Chapman at 2; depo. of Russell at 44. At that point Deputy Cromer suggested placing Russell in leg irons, chains and handcuffs in the holding cell to prevent him from hurting himself. Declaration of Chapman at 2. Russell states he was belly-chained and placed in the drunk tank. Depo. of Russell at 47. Chapman called Harris the next morning about this incident. Declaration of Chapman at 2. Harris was again the one to release Russell from the restraints the following morning. Depo. of Russell at 48. Russell was then taken to the hospital about 9:00 a.m. *Id.* at 47-48.

Russell was finally admitted to Taylor Harden on August 26, 1999, by court order, for an evaluation of his competency to stand trial. Exhibit 12 to defendants' evidentiary material at 1, 10. These records note that "[t]he defendant is not prescribed medications, at this time, despite being seen by individuals from a mental health agency due to his suicidal acts in jail." Exhibit 12 at 10. They also record that Russell first attempted suicide at age 15. *Id.* at 11. These records further state:

> Mr. Russell complained of ongoing suicidal ideation. He reports a number of plans including hanging himself, cutting his wrist with the remnants of a coke bottle or awaiting transfer to prison where he is sure he will be able to complete his plans .... Mr. Russell further reported "someone talks to me." When questioned about this in detail, Mr. Russell reported that it was "like its two of me." He reports this voice tells him "I'm stupid I should go ahead and just kill myself 'cause I ain't gonna never be nothing ... take coke can and cut myself." The defendant reports significant loss in appetite reportedly going up to six days without eating in an attempt to "starve myself to death."

*Id.* The examiner, Vonceil Smith, Ph.D., concludes:

> In summary, available data speak to an individual who at present is suffering from a major affective disturbance and poses a significant risk of harm to himself and others at this time due to an affective disturbance (sic). Further, Mr. Russell's history over time would indicate a guarded to poor prognosis for long term adaptive functioning....

> ... he appears, in my opinion, to be encumbered with respect to competency due to lack of self-serving motivation and his inability to maintain appropriate behavioral control at trial. Further, it seems highly likely that Mr. Russell may make poor choices given his level of distress.  Consequently, I believe that Mr. Russell is in need of immediate inpatient treatment.

Exhibit 12 at 11-12.  He remained at Taylor Harden for sixty-one days. *Id.* at 1.

## 2. Wallace's Claim

Plaintiff Wallace is a diabetic which he treats with Glyberide pills.  Depo. of Wallace at 65, 68; Defendants' exhibit 13 at 2.  He was treated by Dr. Popov for his "sugar" before being incarcerated, beginning in 1990 or 1991.  Depo. of Wallace at 65, 68-69, Declaration of Popov at 2.  Dr. Popov states that he was present at the emergency room when Wallace was admitted with a history of being unresponsive at the jail.  *Id.*  Dr. Popov states that upon arrival, Wallace was responsive and complained that he had headaches after being struck in the head by another inmate two weeks prior.  His blood sugar at the time was "slightly elevated." *Id.*  Because of the head injury, he had Wallace transferred to DCH Regional Hospital in Tuscaloosa for further testing. *See* plaintiffs' exhibit 21, emergency department record.  DCH's records show a diagnosis of "headache, no sign of internal head trauma."

14

Defendants' exhibit 13 at 2, 3. The "history of present illness" section of the medical record makes no mention of any type of diabetic complications. *Id. See also* plaintiffs' exhibit 22.

Popov states "Wallace was in stable condition and exhibited no signs that he was in any immediate danger while under my care and certainly was not in a diabetic coma or suffering from ketoacidosis." Declaration of Popov at 1. In his opinion, Wallace's blood sugar was not related to the symptoms with which he presented and did not place him in any medical danger. *Id.* at 2.

Wallace states that he had been feeling badly for two weeks prior to this incident and asked Fleming when he could have a doctor's appointment, because Wallace had already filled out a request and had received no response. Depo. of Wallace at 127. Wallace testified that Fleming told him to see Arthur Harris. *Id.* Wallace again filled out a medical form, requesting that his sugar be checked. *Id.* at 128. Although he was taking his medication, he had been dizzy. *Id.* at 129. He filled out further requests for medical attention after this. *Id.* at 130. However, he also states he had been hit in the head about this time. *Id.* Wallace did not get to see a doctor until he was taken to the emergency room by ambulance. *Id.* at 132.

Wallace states he eventually talked to Harris about needing to go to a doctor because his head was hurting and was told by Harris that "I'm only one inmate, and they couldn't stop their jobs just to take me to the doctor." *Id.* at 130. Wallace testified Boddie told him to quit writing "I need help" and to write "I need to go to a doctor." *Id.* He states he was requesting to go because of his head and wanting his sugar checked. *Id.* at 131.

15

According to Popov, Wallace's diabetes was a mild case and his blood sugar was better controlled while in jail than before he was arrested. Declaration of Popov at 2. Popov states that Wallace's medical problems were less serious while he was incarcerated than before. *Id.* During his deposition, Wallace was asked whether he was able to receive his medication while in jail, and responded that a few days after he was placed in jail, he went to the doctor, got a prescription and the jail personnel went to the drugstore and had it filled. Depo. of Wallace at 98.

Fleming states that after Wallace was taken to the hospital in August 1998, he inquired what had happened and learned that Wallace is a diabetic. Declaration of Fleming at 3; depo. of Fleming at 51. He is aware of Wallace's allegation that he did not receive his medication as prescribed and states that no one reported to him and he was not aware that Wallace did not receive his medication as prescribed. Declaration of Fleming at 4. Harris echos this lack of knowledge as well. Declaration of Harris at 4. However, other inmates apparently had the same complaint of not receiving medications as prescribed. *See* affidavit of Lecreeta Jackson, submitted as plaintiffs' exhibit 4, at 2.

Wallace had also been taken to the hospital for treatment on July 20, 1999 due to an infection in his foot. Depo. of Wallace at 57-58. He injured it stepping off the raised platform on which the commode sits. He explained that there used to be a steel cage around the bathroom part of the cell, and the front of the cage had been cut out. *Id.* at 60. His toe went into a hole. *Id.* at 61. He believes he broke it based on x-rays taken. *Id.* at 57. He had

16

actually injured it on July 10, 1999 and it became infected. *Id.* at 58.  He testified he had problems with swelling and draining out of his toe. *Id.* at 60.  He states that he and the jailers who accompanied him were told that if the swelling in his foot had not gone down in two days, he was to be taken to DCH in Tuscaloosa to a surgeon. *Id.* at 58-59.  Wallace reported to Felicia Davis and another one of the jailers, two days later, that his toe was still swollen and he needed to go to the hospital. *Id.* at 59, 61-62.  He states nothing was done that day. *Id.* at 62.  He was, however, taken to Family Health Care for further treatment on his foot, and never told he needed surgery. *Id.* at 65.  He admits he received treatment for his foot after he wrote grievances and "kept asking for help." *Id.* at 192.

Wallace also testified that he had made a doctor's appointment before he came to the jail for a date shortly after his incarceration.  He stated that he went to that appointment. *Id.* at 95.

### B.  42 U.S.C. § 1983 – Inadequate Nutritious Food

Russell testified that when he first took up residence in the Bibb County Jail, he weighed 145 pounds.  When he arrived at Taylor Hardin, he weighed 150 pounds.[12]  He agreed that he gained five pounds while at the Bibb County Jail.  Depo. of Russell at 55.  He also remembers getting fresh vegetables at the jail "a couple of times probably." *Id.* at 73.

---

[12]The medical records from Taylor Hardin, submitted by defendants as exhibit 12, actually record a weight for Russell of 167 lbs. upon his arrival.  He was described as a "well developed, well nourished, slender built white male..." Exhibit 12 at 7.

Other inmates also complained concerning a lack of balanced meals. *See* affidavit of Jackson, at 2.

Harris states that in the Fall of 1999, he consulted Mitzi Elliot at the Bibb Medical Center for assistance in planning menus for the jail. She later provided them with four weeks worth of menus. Declaration of Harris at 4; declaration of Davis at 2; declaration of Elliot at 1. Harris and Davis state before the menus were received, the food served was "well prepared, wholesome and similar to the meals that I eat myself and that other members of the community eat at home and in the local restaurants .... In my opinion, the portions certainly provided the inmates enough to eat." Declaration of Harris at 4; declaration of Davis at 2. Harris testified in deposition that he spoke with Fleming about jail maintenance, food preparation, food purchasing and inmates three to four times a week. Plaintiffs' exhibit 1 at 15. Harris also testified that he is responsible for food preparation at the jail and either he or Davis oversaw the preparation of food on a day-to-day basis. *Id.* at 33.

Dr. Popov states that at no time during his treatment of Wallace did he believe Wallace was malnourished. Declaration of Popov at 3. Wallace's main complaint concerning the food seems to be a lack of condiments. Depo. of Wallace at 143.

Kevin Crowe, as past employee at the Bibb County Jail, alleged that at times, no items listed on the menu would be present in the jail and that Harris would tell cooks to "make due" (sic). Affidavit of Crowe at 1.

### C.  42 U.S.C. § 1983 – Inadequate Toiletries and Jail Conditions

Plaintiff Russell states he was denied soap, toilet paper, and "just basic hygiene stuff" while at the jail. Depo. of Russell at 58. His mother brought him shampoo, deodorant, soap, toothpaste, and a toothbrush to the jail.  *Id.*  Russell admits that the jail did provide the inmates with toilet paper, but not what he deemed to be a sufficient quantity and had to beg for more, which he would receive.  *Id.* at 60.

Wallace states he was issued a mattress to place on the floor at the time he was incarcerated due to the jail being full, and he did not have any bedding to place on the mattress until some friends brought him clean clothes, blankets and quilts. Depo. of Wallace at 78. He also testified that the people who brought him blankets and his clothes also brought him his pills.  *Id.* at 98.

Wallace states he was denied toilet paper while at the jail. Depo. of Wallace at 154. He states he had to beg and sign for it. He would ask for more, but did not get it.  *Id.* However, Wallace testified that he was able to maintain his personal hygiene while at the jail, although he could only bathe when "that water wasn't broke."  *Id.* at 161. He states this happened on several occasions and it was fixed within two days. He also stated that the hot water heater which stopped working was fixed "over a period of time."  *Id.*

Defendants state jail policy is to provide each inmate, upon his or her arrival, with a "hygiene package" which contains a razor, soap, shampoo, toothpaste and a toothbrush. They further state that inmates are provided with towels and bed linens including a pillow,

pillowcase, blankets, and toilet paper is provided in the cell. Declaration of Fleming at 4; declaration of Harris at 4; declaration of Davis at 2. They are unaware of these items not being provided and state the same would violate jail policy. Declaration of Fleming at 4; declaration of Harris at 4. Harris and Davis add that toilet paper was doled out as it was used up due to problems with inmates hoarding it. Declaration of Harris at 4; declaration of Davis at 2.

Wallace testified that he did not receive a toothbrush, toothpaste or a towel upon his arrival at the jail. Depo. of Wallace at 205.

### D. ADA Claim

Wallace testified that he stated when he was booked that he had a disability, but requested no accommodations. Depo. of Wallace at 84-85, 88. He further states that he told the jailers he had to take his time going up steps and they gave him time to hold the rail and climb the steps. *Id.* at 88. Wallace testified that handrails were not installed in the jail or even the shower area. *Id.* at 205.

### II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

20

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-252.

### III.  Legal Analysis

### A. The medical claims

Prison officials have a duty to provide humane conditions of confinement and ensure that prisoners receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). While prisons need not be comfortable, they may not be inhumane. *Id*. Only "unnecessary and wanton" infliction of pain are prohibited by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct.1078, 1084, 89 L.Ed.2d 251 (1986). Crucial to establishing conditions which fall below this minimal requirement is some proof that officials acted with specific intent. This specific intent requirement for an Eighth Amendment violation applies to the failure to provide

22

proper medical care.[13] *Campbell v. Sikes*, 169 F.3d 1353, 1362 (11th Cir.1999); citing *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir.1996).

In *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419 (11th Cir.1997), the Court stated that "the clearly established statutory and constitutional rights" test under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) is met when a jail official acts with "deliberate indifference to the serious medical needs of the detainee..." *Lancaster*, 116 F.3d at 1425 (stating this was a "clearly established violation of constitutional rights at the time the plaintiff was arrested). *See Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186-1187 (11th Cir.1994) (defining "serious medical need" as "one that is so obvious that even a lay person would recognize the necessity for a doctor's attention"). In considering the reasonableness of defendants' actions, the court considers not only the law established at the time of the relevant incident but also "the information possessed by the official at the time the conduct occurred." *Lancaster*, 116 F.3d at 1325; citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir.1996).

This standard has both an objective and a subjective component. *Hill,* 40 F.3d at 1186; *Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir.1994). The objective component requires

---

[13]While pre-trial detainees have the protections of the Fourteenth Amendment and not the Eighth Amendment, the standard for liability under either is essentially the same. *See Jordan v. Doe*, 38 F.3d 1559, 1563 (11th Cir.1994). In *Hamm v. Dekalb County*, 774 F.2d 1567 (11th Cir. 1985), the Eleventh Circuit held that the Eighth Amendment of cruel and unusual punishment applies only to convicted inmates and not pretrial detainees. Rather, such a claim must be brought under the Fourteenth Amendment. *See Lancaster*, 116 F.3d at 1425 n.6; *Jordan,* 38 F.3d at 1564-65. Thus, to whatever extent the plaintiffs are stating claims for excessive force under the Eighth Amendment, the court shall grant the defendants' motion for summary judgment, but shall consider the same under the Fourteenth Amendment.

a showing that a condition of confinement rises to the level if cruel and unusual punishment; the subjective component requires a showing that jail officials were deliberately indifferent to that condition. *Campbell,* 169 F.3d at 1363; *Wilson v. Seiter*, 501 U.S. 294, 298-299, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The subjective component requires a showing of deliberate indifference – knowledge of the need for medical care and intentional refusal to provide that care. *Campbell*, 169 F.3d at 1363; *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989).

To establish "deliberate indifference" the plaintiffs must show: 1) subjective knowledge of a risk of serious harm; 2) disregard of that risk; 3) by conduct that is more than mere negligence. *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir.1999) (citations omitted). The Court further states that "in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *McElligott*, 182 F.2d at 1254; citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This is not a requirement that the plaintiffs must show a prison official acted or failed to act believing that a harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981. However, plaintiffs do not have to show that the defendants were personally involved in the actions which they allege violated their constitutional rights. *Marsh v. Butler County*, 212 F.3d 1318, 1327 (11th Cir.2000). Personal participation is only one of several ways to establish the requisite causal connection. "An

24

official may be liable where a policy or custom that he established or utilized results in deliberate indifference to an inmate's constitutional rights. *Marsh*, 212 F.3d at 1327; citing *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir.1986).

Whether the "prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official the knew of a serious risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981.

The Eleventh Circuit has stated that summary judgment "must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" *McElligott*, 182 F.3d at 1255; citing *Campbell*, 169 F.3d at 1364.

Plaintiff Russell's claim regarding the defendants' failure to provide him adequate medical care concerns allegations of lack of psychiatric services as well the use of belly chains and the drunk tank to foil his threats of and attempts at suicide. The Eleventh Circuit has recognized that psychiatric needs can constitute serious medical needs and that deprivation of those needs can satisfy the objective prong of the prison condition inquiry. *See Steele*, 87 F.3d at 1269. The United States Supreme Court stated "[a]n inmate must rely

on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290.

Applying this law to the above facts, the court finds that plaintiff Russell has stated a claim upon which summary judgment would be inappropriate. The evidence before this court establishes that Russell suffered from severe depression, his suicide threats were widely known, including by Harris and Fleming, and his requests for psychiatric services were routinely ignored until he happened upon Trent Bamburg at the jail. Even after he began counseling with Bamburg, Russell asked for psychiatric treatment, stating counseling was not helping. No attempt was even made by defendants to obtain a psychiatrist' services, and Russell thereafter slit his wrist, clearly evincing an injury from the alleged lack of treatment. From this, a factual dispute exists as a reasonable jury could conclude that Fleming and Harris exhibited deliberate indifference to Russell's medical needs in violation of his constitutional rights. Furthermore, a jury could find that Harris and Fleming exhibited deliberate indifference to the jailers' compliance with the jail regulations, knowing serious injury could result to Russell. For example, Harris testified that a jailer should call Indian Rivers if an inmate threatens suicide, but there has been no evidence presented to this court that this was done during the February, 1999 incident in which Russell was belly-chained. Clearly Harris knew about this incident, for he unchained the plaintiff. Similarly, while testimony is before the court that a suicidal inmate should be placed in a cell where all objects with which he could cause himself harm have been removed, Russell obtained bed

26

sheets he had previously braided together to use to hang himself within fifteen minutes of being placed in a cell where he could be on a suicide watch.[14]   This, of course, was immediately after Russell used a razor to slice his wrist, although Trent Bamburg had warned the jailers to limit Russell's access to objects he could use to cause himself harm.   The defendants' motion for summary judgment on this count of the complaint is therefore due to be denied.[15]

Plaintiff Wallace, on the other hand, has failed to establish sufficient evidence that a reasonable jury could conclude that the defendants' exhibited deliberate indifference to his medical needs.  By his own testimony, he was assisted in keeping a doctor's appointment he made before his incarceration, his prescription was filled for him, and the evidence simply does not support his allegation of a diabetic coma as the cause for his unconsciousness. Although diabetes is a serious medical condition, Wallace has failed to submit any evidence in support of his allegation that he was deprived of medication and that such deprivation caused or even contributed to his becoming unconscious.  In other words, Wallace received medical attention for each of his medical needs.  As such, the court shall grant summary judgment as to Wallace's claims of inadequate medical care.

---

[14]The defendants argue that the braided bed sheets were "hidden".  Considering the seriousness of Russell's condition and the need for him to be placed in a cell where he was safe, checking the cell for items which could be used by an inmate to inflict harm upon himself would be a reasonable measure to prevent him from doing so.

[15]While the defendants raise the point that Russell only raises the first belly-chaining incident in the Complaint, the court notes that the Complaint was filed in March, 1999, and the second incident wherein Russell was so chained did not occur until May, 1999.

Although hard to decipher from the complaint in this case, the court finds that the plaintiffs also state an excessive force claim concerning the use of the belly chains on Russell. Russell must show that force was applied maliciously or sadistically for the very purpose of causing harm and not applied in a good faith effort to maintain or restore discipline.[16] *Campbell*, 169 F.3d at 1374; citing *Whitley*, 475 U.S. at 320-321, 106 S.Ct. at 1078. *See also Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The court finds from the evidence before it that Russell requested mental health care, threatened suicide, was belly-chained for such threat, still did not receive mental health care and that Harris had knowledge of such facts.[17] As such, the court finds that summary judgment on this issue is due to be denied.

## B. The Food Claims[18]

To establish a 42 U.S.C. § 1983 claim regarding the quality of food, the plaintiffs must show that the food was of insufficient nutritional value to preserve health. *Hamm*, 774 F.2d at 1575. Clearly, from the evidence submitted to the court, the court need not look far

---

[16]Although the plaintiffs' complaint does not specify, the court finds that under the facts of this case, Wallace would have no claim for excessive force and does not allege or put forth evidence that the same was ever used against him. To whatever extent Wallace may make such a claim, the same is due to be dismissed.

[17]The defendants state that "[i]t is undisputed that [Russell] was prevented from carrying out his threats [of suicide] due to being restrained." Defendants' reply at 2. While this is undoubtably true, the court finds counseling at that time (in February) or psychiatric services may have also accomplished the same end.

[18]Because the court finds the plaintiffs' claims regarding the quality of jail food are due to be dismissed on their merits, the court does not consider whether the same are barred by the procedural requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

to find that the food at the Bibb County Jail was sufficient to preserve health. The evidence establishes that Wallace's only testimony in this regard is that his hot dogs and bologna sandwiches came without condiments. Dr. Popov opined that at no time during his incarceration did Wallace suffer from malnutrition.[19] Russell, who was a cook at the jail, gained several pounds while incarcerated at Bibb County Jail. The plaintiffs have failed to submit any evidence that the quality of the food served to them was so poor that it failed to preserve health.[20]

### C. Jail Condition Claims[21]

To establish a claim that the defendants violated clearly established law by displaying deliberate indifference to a substantial risk of harm to inmates, the plaintiffs must put forth evidence tending to show 1) that they were incarcerated under conditions posing a substantial risk of serious harm and 2) that prison officials demonstrated deliberate indifference to inmate health and safety. *Marsh*, 212 F.3d at 1328, citing *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. Whether a particular condition of confinement constitutes cruel and unusual punishment is an objective inquiry. *See Wilson*, 501 U.S. at 298-299, 11 S.Ct. at 2324.

---

[19]While the court finds no evidence that the food failed to preserve health and thus fell below Constitutional standards, the court seriously questions the defendants' claims that the food served at the jail was not very different from that served at restaurants.

[20]The court also notes that evidence established that the inmates had access to a soda machine in their day room and that snacks were sold to them.

[21]As stated in footnote 15, *infra*, because the court finds the plaintiffs' claims regarding jail conditions are due to be dismissed on their merits, the court does not consider whether the same are barred by procedural requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

Under this inquiry, prison conditions are cruel and unusual when they result in an "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Jail officials undoubtedly have a duty to provide prisoners with "reasonably adequate" food, clothing, shelter, and sanitation. *Id.* Only extreme deprivations make out a conditions-of confinement claim. "Only those deprivations denying 'the minimum of civilized life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000.

Whether jail officials exhibit deliberate indifference to conditions of confinement which inflict unnecessary pain or suffering is a subjective inquiry. *Campbell,* 169 F.3d at 1363. Thus, the officials must "knowingly or recklessly disregard an inmate's basic needs" to find "deliberate indifference." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir.1993). The officials must know of and disregard an excessive risk to inmate health or safety, must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must then draw that inference. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

While Harris and Fleming both state that each inmate is provided this toiletries, bed linens and the like, the plaintiffs complain that they were not furnished with these things. However, they both testified in deposition that their family members and/or friends were allowed to bring them any such items they wanted. Furthermore, no evidence was submitted to the court that either Fleming or Harris had any knowledge that the inmates did not

30

received the toiletry kits or bed linens.  Thus, this court finds that the plaintiffs were not

deprived of basic human needs.  Jail officials are under no Constitutional obligation to make

their jails comfortable or to provide "every amenity which some person may think is needed

to avoid mental, physical, and emotional deterioration.  *Johnson v. United States*, 816

F.Supp., 1519, 1523 (N.D.Ala.1993); citing *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.

1977), *rev'd in part on other grounds sub nom, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct.

3057, 57 L.Ed.2d 1114 (1978).   Furthermore, even if the plaintiffs were so deprived, they

have submitted no evidence from which a reasonable jury could find that Harris and Fleming

had knowledge of the deprivation.  As such, the court shall grant summary judgment on this

claim in the plaintiffs' complaint.

Similarly, while the plaintiffs' complaint also recites unsanitary conditions at the jail,

no admissible evidence of these conditions was put forth by the plaintiffs.  Wallace even

testified he was able to maintain his personal hygiene while incarcerated.  The plaintiffs also

state in their complaint allegations of faulty wiring and insufficient heating.  No evidence

that such conditions existed has been submitted nor evidence that the defendants exhibited

deliberate indifference to such conditions.  Rather, the evidence before this court is that

efforts were made to keep the building systems in working order and to have repairs made

made when they were not.[22] As such, the court must grant summary judgment in favor of the defendants on these claims.

### D. ADA claims

In their Amended complaint, the plaintiffs allege that they were denied benefits because of their disabilities, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. However, this court can find no evidence that the plaintiffs' were denied care "because of" their disabilities.[23]   Clearly, they requested care because of their disabilities. Rather, the plaintiffs' evidence demonstrates that any care they allegedly did not receive was due to a disregard of those medical needs, and not because they were perceived to be disabled. Further, the plaintiffs submitted no evidence or argument in support of these claims.   In fact, the plaintiffs list four issues on which they allege genuine issues of material fact remain.   *See* plaintiffs' statement in opposition at 1-2.   Their allegations of discrimination based on disability is not among these. Further, Wallace testified he requested no accommodations and that he was allowed additional time to climb stairs. Plaintiffs having presented insufficient evidence to make out a claim under the ADA, the court finds that the defendants' are entitled to summary judgment on this count of the Amended complaint.

---

[22]Although Wallace complained of having to sleep on a mattress on the floor, this is not necessarily a constitutional violation. *See Hamm*, 774 F.2d at 1575-76.

[23]The court, examining the evidence in the light most favorable to the plaintiffs, assumes for purposes of the ADA claims that the plaintiffs do suffer from disabilities as defined by the ADA.

## IV. The Defendants' Claim for Immunity

The defendants raise in their brief in support of their motion for summary judgment that they are both entitled to Eleventh Amendment Immunity as to claims against them in their official capacity.  The court finds that in *Lancaster*, 116 F.3d at 1429, the Eleventh Circuit ruled that sheriffs and jailers act as officials of the State of Alabama, thus claims against them in their official capacities create an imposition of liability on the State of Alabama. *See Turquitt v. Jefferson County*, 137 F.3d 1285, 1289 (11th Cir. 1998).  As such, government officials are immunized from in their official capacities.  *Marsh*, 212 F.3d at 1326; citing *Zatler*, 802 F.2d at 400.   Thus, the defendants are entitled to Eleventh Amendment immunity as to all claims for monetary damages against them in their official capacities.

The defendants also argue that they are entitled to qualified immunity in their individual capacities as to all of the plaintiffs' claims. Defendants' memorandum brief at 15. Qualified immunity protects government officials from civil suit when they have acted within their discretionary functions in a manner that violates "no clearly established statutory or constitutional rights of which a reasonable person would have known." *See Marsh*, 212 F.3d at 1326; *Lancaster*, 116 F.3d at 1424-1425; citing *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738.  As stated above, the court finds that questions of fact remain concerning plaintiff Russell's claims for violations of his 42 U.S.C. § 1983 rights with regard to the alleged lack of mental health care and excessive force.  This includes questions as to whether

the defendants' actions violated clearly established Constitutional rights of which a reasonable person would have known. As such, the court finds that the defendants are not entitled to qualified immunity for Russell's claims (lack of medical care and excessive force) against them as individuals.

### V.  Conclusion

In accordance with the above finding, it is therefore **ORDERED** by the court that the defendants' motion for summary judgment be and hereby is **GRANTED** on all counts of the complaint as to plaintiff Wallace.  It is further **ORDERED** by the court that summary judgment is **DENIED** as to plaintiff Russell's claim under 42 U.S.C. § 1983 for inadequate medical care and excessive force.  Summary judgment is **GRANTED** as to plaintiff Russell's other claims under the complaint.  Summary judgment is also **GRANTED** on Count VI, found in the amended complaint.

**DONE** and **ORDERED** this the ___7___ day of September, 1999.


UNITED STATES DISTRICT JUDGE
INGE P. JOHNSON

34